■ In the Matter of MARK GARDNER, Appellant, v BASSETT MEDICAL CENTER et al., Respondents. [48 NYS3d 847]—

Egan Jr., J. Appeal from a judgment of the Supreme Court (Coccoma, J.), entered May 28, 2015 in Otsego County, which dismissed petitioner's application, in a proceeding pursuant to Mental Hygiene Law § 33.14 (a) (1), for an order sealing his psychiatric records.

At all times relevant, petitioner was a student at the State University of New York at Cobleskill in Schoharie County. In early 2013, petitioner sent a text of an apparently concerning nature to one of his professors; although the precise nature of the text is not disclosed in the record,[1] this incident—according to petitioner—resulted in the involvement of law enforcement and appears to have marked the beginning of a deteriorating relationship between petitioner and the university. At the beginning of the summer of 2013, petitioner moved into a hotel because he "didn't feel safe on the campus" and, in August 2013, suffered an alcohol-induced blackout—during the course of which he sent a text expressing suicidal thoughts.

As a result of his personal experiences on campus, petitioner began to lobby university officials "to insure that when the school police question a student with possible mental health issues that a mental health advocate is present to act as an advocate for the student." To that end, petitioner met with the university's president on November 21, 2013 to discuss this and other issues; also in attendance at that meeting was one of the university's therapists, with whom petitioner previously had spoken "about various personal issues in [his] life." Although the meeting apparently ended without incident, petitioner and the therapist continued to speak in the hallway afterwards, during the course of which—the therapist subsequently reported—petitioner became "agitated, hostile and angry" and "blam[ed] the school for his current problems, depression, poor grades and [the] suicidal episode in August of [that] year." As the conversation continued, petitioner made

---

1. The record does reflect, however, that petitioner reported to the professor that he suffered from bipolar disorder.

reference to "violent acts"—invoking the 1999 shooting incident at Columbine High School in Colorado—and the connection between such violent episodes and "those who snap," stating, "[P]eople wonder why these people snap[;] it's because of the situations like I am going through that cause them to snap and do what they did." Petitioner also made reference to New York's Secure Ammunition and Firearms Enforcement Act, more commonly known as the SAFE Act (L 2013, ch 1), which he previously had characterized as a "new law [that] was aimed to take his weapons away," theorizing that the law "cause[d] people to disengage in therapy, leading to an increase in murder/suicides." Shortly after making that statement, petitioner terminated his counseling relationship with the therapist.

Concerned that petitioner "may have underlying plans for violence," the therapist arranged for an emergency psychiatric admission pursuant to Mental Hygiene Law § 9.39. As a result, petitioner was involuntarily committed to respondent Bassett Medical Center from late in the evening on November 21, 2013 to early in the morning on November 24, 2013.[2] The stated basis for the emergency admission was paranoid delusions and threats to harm others. During the course of his stay, petitioner was evaluated by a number of medical professionals, including two psychiatrists, and petitioner variously reported and then denied a prior diagnosis of bipolar disorder. According to the psychiatrist who evaluated petitioner upon his admission, although petitioner did not exhibit evidence of any delusions or obsessions and denied "frank suicidal ideation," petitioner expressed "clearly helpless[,] hopeless and depressed thinking." In addition, petitioner's demeanor was described as "tense" ("with paranoid flavor somewhat cryptic at times"), his thought processes were characterized as "overinclusive" and possessing a "more obsessional style," his insight was assessed as "[p]oor with marked use of denial," his judgment was deemed to be "diminished" and his capacity was described as "limited, impacted on by his perceptions with a paranoid flavor." Against the backdrop of petitioner's stated (and then denied) bipolar disorder, concerns that he may also be suffering from an "affective disorder" or "isolated paranoid disorder," the statements made to the university's therapist and petitioner's prior history, the admitting psychiatrist determined that petitioner was in need of involuntary hospitalization "for acute stabilization of [his] psychiatric symptoms" and to safeguard petitioner's safety and the safety of others. Although another psychiatrist

---

2. On November 24, 2013, petitioner executed a voluntary request for hospitalization, which extended his stay until November 26, 2013.

subsequently concluded that she could not extend petitioner's emergency admission beyond the initial 48-hour period (*see* Mental Hygiene Law § 9.39 [a] [2]), petitioner elected, as noted previously, to voluntarily admit himself for an additional two days.

Thereafter, in March 2015, petitioner commenced this proceeding pursuant to Mental Hygiene Law § 33.14 (a) (1) against the hospital and respondent New York State Office of Mental Health seeking to seal his psychiatric records. Respondents opposed the application. Following a hearing, Supreme Court, relying upon petitioner's hospital records and the affidavits tendered in support of and in opposition to petitioner's application, denied petitioner's sealing request, finding, among other things, that petitioner failed to demonstrate that he was illegally detained. This appeal by petitioner ensued.

We affirm. Pursuant to the provisions of Mental Hygiene Law § 33.14 (a) (1), "[a]ny person who has been admitted to receive inpatient or outpatient services for mental illness may commence a special proceeding . . . for an order directing the sealing of those records . . . upon a finding that . . . the petitioner was illegally detained by a facility by reason of fraud, error or falsified documents, and the records pertain to such illegal detention." Here, petitioner was admitted under the emergency admission procedures set forth in Mental Hygiene Law § 9.39 (a), which permits a hospital director to "retain . . . as a patient for a period of [15] days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself [or herself] or others." For purposes of the statute, the required likelihood of harm means either a "substantial risk of physical harm to himself [or herself] as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he [or she] is dangerous to himself [or herself], or . . . a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm" (Mental Hygiene Law § 9.39 [a] [1], [2]; *see Matter of Rueda v Charmaine D.*, 17 NY3d 522, 529-530 [2011]). An individual may be admitted under the statute "only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements" of the statute and, as alluded to previously, a person so admitted cannot "be retained for a period of more than [48] hours unless within such period such finding is confirmed after examination by another physician who shall be

a member of the psychiatric staff of the hospital" (Mental Hygiene Law § 9.39 [a] [2]; *see Matter of Rueda v Charmaine D.*, 17 NY3d at 530).

As petitioner does not contend that his involuntary admission was procured by fraud or falsified documents, his application for sealing may succeed only if he can demonstrate that such admission was erroneous. To that end, petitioner tendered his hospital records and the affidavit of John Tanquary, a licensed psychiatrist, who opined that, based upon his October 2014 evaluation of petitioner and a review of petitioner's hospital records, petitioner "did not meet the criteria for involuntary hospitalization . . . and should never have been hospitalized against his will." To our analysis, this conclusory and hindsight assessment of petitioner's mental status at the time of his involuntary admission in November 2013—an assessment that is both predicated in large measure upon petitioner's self-reporting of that event and otherwise minimizes the documented psychiatric symptoms displayed by petitioner upon his admission—falls short of demonstrating that petitioner's hospitalization was in error within the meaning of Mental Hygiene Law § 33.14 (a) (1). At best, Tanquary's affidavit reflects a difference of opinion between the psychiatrist who evaluated petitioner upon his admission and the psychiatrist who evaluated him nearly one year later, and this conflicting medical opinion does not demonstrate that petitioner's involuntary admission was erroneous.

In reaching this result, we acknowledge that petitioner and his expert focus on the propriety of petitioner's initial, involuntary admission—claiming that respondents failed to satisfy the criteria set forth in Mental Hygiene Law § 9.39 (a). It is important to note, however, that it is petitioner, and not respondents, who bears the burden of proof here. Notably, petitioner did not commence a proceeding to challenge his initial admission to the hospital and, at the end of the 48-hour period, consented to a voluntary admission. Hence, even assuming, without deciding, that an emergency admission pursuant to Mental Hygiene Law § 9.39 (a)—once challenged— compels the admitting facility to present clear and convincing evidence to justify its retention of the affected patient (*compare Rodriguez v City of New York*, 72 F3d 1051 [1995], *with Matter of Boggs v New York City Health & Hosps. Corp.*, 132 AD2d 340 [1987], *appeal dismissed* 70 NY2d 972 [1988]), that simply is not the nature of this proceeding, and nothing in the case law imposes either that burden or that evidentiary standard upon respondents in the context of the instant sealing applica-

tion. Accordingly, we agree with Supreme Court's dismissal of petitioner's application.

Peters, P.J., Rose, Devine and Aarons, JJ., concur. Ordered that the judgment is affirmed, without costs.